The bill then stated a recovery effected at law for the purchase money, and prayed that the plaintiff at law might be perpetually enjoined, etc.
The defendants, by their answers, admitted the purchase by them of the site of Jackson, the sale of the lots; that they had advertised as usual to give publicity; but they each denied, in substance, the fraudulent representations charged in the bill, and insisted that the plaintiff was better acquainted with the natural advantages of (37) the site and of the river than they, and purchased upon his own judgment, but alleged the existence both of coal and slate in the vicinity of Jackson. They denied the employment of puffers, alleging that the purchases made by Rawlins were not for the benefit of the company, and that Paxton was not employed to bid by them.
Proofs having been taken and the cause set for hearing in the court of equity below, it was transmitted here.
The printed advertisement referred to in the bill stated:
That Jackson was situated opposite the Eagle Falls on Dan River, above which the river was not navigable; that it possessed advantages that no other town on the Roanoke could possess, being at the upper point of navigation, and having immediately in its vicinity an inexhaustible bank of excellent pit coal, and an extensive quarry of slate, and the Eagle Falls possessing many excellent sites for mills and other waterworks; that commercial houses were erecting for the transaction of business to a considerable extent, and that it was hoped or expected that a share of bank capital would be deposited there.
On the hearing many depositions were read, of which the following alone are material:
Stokely F. Foster deposed that he was upon terms of intimacy and familiarity with the defendants; that some time in the spring of 1818 most of the defendants associated themselves together, and generally passed under the denomination of the "Jackson Company," each contributing to one common stock the sum of $500 or $1,000. They frequently made excursions up the Roanoke for the purpose of fixing on a site for a town, and ultimately concluded to establish one at the "Eagle Falls" on Roanoke, to be called Jackson. The motives of the *Page 30 
(38) company for selecting this location were made known to deponent, and were two — first, that the company were interested in the town of Danville, Va., also on Roanoke, which was likely to suffer from the expected competition of "Leaksville," another town about to be erected near it, and from which they wished to direct public attention by fixing it on Jackson; secondly, that they were actuated by considerations of a speculative nature. The deponent was employed by one of the company to go to Lynchburg, Va., to advertise in the public papers the sale of lots, and to procure and post up handbills specifying the day of sale and enumerating the advantages attending "Jackson." Among other things, those advertisements extravagantly asserted that Jackson was well calculated as a repository for produce, and that it would eventually supersede Danville. This deponent frequently heard one of the company boast of his great influence in gaining friends for their project, and appeared particularly pleased that he had prevailed on the plaintiff (Morehead) to enlist in their cause; that about the time the sale was advertised one of the original company (who is not a defendant in this case, and who withdrew from the company) expressed great dissatisfaction at the manner in which they were proceeding, and by so doing incurred the displeasure of most of them, so much so that they were frequently heard to say that they were resolved to get clear of him, and finally effected their determination; his place was supplied by another, and the company was increased by the accession of one or two, all of whom constitute the present defendants. This deponent also said that about the commencement of the sale of lots the company caused to be made a brilliant display of goods and groceries, which they had previously prepared and arranged on the spot, and that they kept boats continually plying and bugles continually winding on the river that flowed adjacent. That one of the defendants said to this (39) deponent "that their plans had taken so well that even those who had determined not to buy were alarmed for fear that they could not refrain from buying." The deponent further said that he was not present at the sale of the first lot, but heard several of the defendants say that it would go high, as an example by which the sale of the others might be governed; that when he went up where they were selling the second lot, he inquired who bought the first, and was told that it was purchased by James Conner for the sum of $700; it was also publicly said by defendants that Conner was purchasing for gentlemen in Lynchburg. Several of the defendants also said that the lots were going too low, and that Conner had refused $1,500 for the one purchased by him. Deponent also heard much about a bank agency, and in a reservation of certain lots one was pointed out as being intended for a bank. This deponent bought two lots, but was advised by one of the defendants not *Page 31 
to buy any more, saying, "You know the company and their plans as well as I do, and that they say a great deal more than they ought." One, John A. Sims was very active, bid very frequently, was openly encouraged by the defendants, and promised that if he would be industrious he should have a lot at his own price; a lot was afterwards cried out to him for $600, but he was permitted to take it at $250, for which sum only he executed his bond. In the course of the sale several other lots were bid off by Sims, but he executed only one bond, as above mentioned. Some of the company seemed much displeased at this, but others said that his services had been worth more to the company than five lots. This witness further deposed that since the sale he heard one of the company ridicule the surprising simplicity betrayed by the people, saying that they were the most complete fools he had ever seen; that he had made them believe he was Christ himself, and had really induced old Morehead to think that in one month the city of Norfolk would be deserted by all its enterprising merchants and that they would be transplanted in Jackson.
James Conner, who is mentioned in Foster's evidence, deposed (40) that he was authorized and requested by the company to run the first lot as far as $1,000; that it was cried out to him at $700; that he was not empowered to bid for any other persons than the company; that he frequently heard the company assert that he had been offered $1,500 for the lot he bid off; that he had received no such offer, and that if he had, and the lot had been his, he should certainly have taken it. This deponent frequently heard the company say that they intended to invest a large amount of capital and carry on an extensive business; that they were very active in persuading the people to buy; said they intended to erect several large merchant mills, etc. This deponent was well acquainted with all the company, but one; that it was not known by any but the company who he purchased the lots for in reality until after the sale; that it was said by the company publicly that there was a plentiful supply of pit coal and slate convenient to Jackson; but that it is now generally said, and this deponent believed truly, that there is neither.
It was in evidence that some of the defendants represented that they had offered to a Mr. Galloway $75,000 for a tract of land opposite to Jackson. This was contradicted by the deposition of Mr. Galloway. It was also proved that defendants asserted their intention to erect a bridge and invest $80,000 or $100,000 of their capital at Jackson, to give commercial importance to the place; that one of the company would reside there, and that they would stake their last shilling upon its prosperity. It was also clearly shown that none of these things had been done. *Page 32 
It also appeared in evidence that the river could be navigated for 30 miles above Jackson, but whether in small canoes only, or in larger craft, was not shown.
(41) On the part of the defendants depositions were read to impeach the general character of Foster, and others in reply to support him. The defendants also proved that some coal and some slate had been found near Jackson, but the extent of the formation and its quality did not appear. They also proved that after the sale the plaintiff several times expressed his satisfaction at his purchase, and his resolution to abide by it, and that after his first bond fell due, upon being applied to for payment, he asked for indulgence, and gave an order for the payment of it.
When a few years ago the spirit of improving the internal navigation of the State was excited, various were the calculations that were made as to the consequences which would flow from it.
When the Legislature became actuated by the same spirit, and passed many laws to facilitate its accomplishment, there were those who believed that the public agents or companies thereby established, with the means then in their power, could so far improve internal navigation as to give an additional value to property far beyond that at which it was then estimated; others were less sanguine.
A knowledge of engineering and the amount of funds necessary to success in such an important undertaking was very limited. This state of things opened a grand door for speculation, and associations were formed for entering into them, and, like the defendants, purchased (42) up favorite spots of ground for the erection of towns, and sold them out in lots, frequently for enormous prices, far beyond their value. And when the infatuation and delusion under which they were purchased subsided, the law could afford no redress to the purchasers, because the speculation was a fair one; and this remark is applicable to the present complainant, if there was no fraud used in the sale at which he purchased sufficient in equity to set the sale aside. Whether there was or not, it is next necessary to ascertain.
It must be kept in view that the great object to be accomplished was the removal of obstructions in the River Roanoke and making it navigable. It was that only which could give value to towns or lots. If it remained unnavigable, so as not to be the channel through which produce could be sent to market, the lands upon it, whether laid off into towns or not, acquired no additional value. That was the grand pivot on which *Page 33 
speculation turned; whether success attended the enterprise or not, did not depend upon the proprietors of towns or the purchasers of lots. The means intended for that end, and the power directing them, were confided to the Roanoke Navigation Company. If the undertaking terminated successfully, towns and lots would be valuable; if otherwise, they would only retain their original value. In the latter case, the purchasers of lots would find themselves but illy compensated by having bridges erected on the river, or in having coal mines or quarries of slate contiguous to it, or in having sites for manufactories upon it. No doubt if the river was navigable, these advantages would enhance the value of the lots; and taking it for granted that untrue representations were made of them at the sale, I cannot think that the contract for the purchase of the lots ought to be rescinded, because they would acquire their greatest value from the river being made navigable, and not from the coal mines and other advantages before noticed. That the river is not navigable is not the fault of the vendors.
If the case stopped here, I would say that the complainant (43) should be otherwise remedied for the injury sustained by those misrepresentations, but that the sale on that account ought not to be set aside.
There is another allegation of misrepresentation in the bill, that is, that the town of Jackson was at the head of navigation. On this part of the case the evidence is not satisfactory. It has been proved that the river above the town has been navigated a considerable distance, but whether in a light canoe or in what else had not been stated. If it was sufficiently established that the town was not at the head of navigation, and that the land on which it was laid off was of little more or no more value than other lands on the bank of the river in case the river was rendered navigable, I would say that the purchasers did not get that which they contracted for, and that for that reason the sale ought to be set aside.
Again, although Jackson lay below the head of the navigation, yet if it possessed considerable commercial advantages, so that the lots bore some considerable proportion to the price given for them, the purchase probably ought not to be set aside. When a case turns on considerations of this sort, all the circumstances attending it should be made out in evidence.
It is useless to examine this part of the case any further, because there is another objection made to the sale of the lot of more important concern to the vendors, which, I think, must decide the controversy, and that is, the employment of puffers to enhance the value of the lots at the sale. This practice is forbidden by morality and fair dealing, and is condemned by the laws of the country (Cowp., 395, 6 Term, 649), and *Page 34 
the apology cannot be alleged that it was adopted as a defensive measure (if such apology is admissible), to prevent the lots from selling for less than they were worth. (3 Ves., 628.) They had made no experiment (44) in selling any of them when they employed Conner to bid for the first lot that might be offered, to $1,000, well knowing that the price for which that would sell would have a great effect in fixing a higher value upon others, in the estimation of those who might bid for them. It matters not that it has not been proved that any puffer bid for those the complainant purchased. The lots were as articles of the same kind, or as complainant's counsel has better expressed it, they were as yards of cloth of the same web. Other circumstances of puffing have been proved. I think, for this cause, the sale should be set aside.